# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| M.P., et al., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 16-151 |
| | : | |
| CAMPUS COMMUNITY SCHOOL, | : | |
| Defendant. | : | |

**McHUGH, J.**  **October 9, 2018**

**MEMORANDUM**

This is an appeal under the Individuals with Disabilities in Education Act (IDEA) challenging a compensatory education award by a Special Education Due Process Hearing Panel. Plaintiff M.P. is a student with disabilities who attended Defendant Campus Community School (CCS) without an Individualized Education Program (IEP) for nearly three years, despite documented health issues, frequent absences, academic and social struggles, and requests by his first grade teacher and mother that he be evaluated. With his parents (collectively, "Plaintiffs" or the "family"), M.P. filed a Due Process complaint, alleging that CCS failed to provide a free and appropriate education for M.P., as the law requires. The Panel agreed and awarded Plaintiffs nearly two years of compensatory education at $17.50 per hour, imposing a four-year limit on M.P.'s use of the funds. After careful review of the record, I modify the number of compensatory education hours, hourly rate, and time limit imposed, but affirm the remainder of the award.

**I.     Background: Panel's Decision and Administrative Record**

Plaintiff M.P. is a disabled child with a seizure disorder, dyslexia, learning disabilities in reading, math, and writing, and processing and memory issues. After completing kindergarten in a public school, M.P. enrolled in first grade at Defendant Campus Community School (CCS), a charter school, in late August 2011. Months before M.P. started at CCS, his mother notified the

1

school in her initial application that, although M.P. was not then on an Individualized Education Program (IEP) or 504 Plan, he was receiving "extra help with [a] reading specialist" and had epilepsy.[1]  Administrative Record at 426, ECF No. 21 [hereinafter "A.R."].  Despite this, and later, CCS's knowledge of M.P.'s health impairments, his academic and social struggles in the classroom, requests by both his first grade teacher and parent for educational evaluations, and his excessive absences due to documented health issues, including a five-month absence for pertussis, CCS failed to evaluate him until late in his third grade year, and did not implement an IEP until his last week of that year (May 2014).  After three years at the school, M.P.'s family withdrew him from the school in September 2014, at the start of fourth grade.

M.P.'s family filed a timely Due Process complaint in August 2015 asserting that CCS had violated his rights under the Individuals with Disabilities Education Act, 20 U.S.C. § 1414 (IDEA).  Pursuant to Delaware's IDEA structure, the family's complaint went before a three-member Due Process Panel [hereinafter "the Panel"], which considered thousands of pages of records and conducted a two-day hearing in November 2015.  The Panel issued its decision on December 11, 2015.  *See* Decision and Order, A.R. at 6–19 [hereinafter "Panel Decision"].

In its decision, the Panel summarized the hearing testimony and set out its factual findings and legal conclusions.  Unfortunately, the phrasing of many of these findings and conclusions are vague and their underlying rationale even less clear.  Indeed, the simple language of the Decision is at times difficult to comprehend because of its disjointed sentences and typos.  What follows is my best attempt to decipher the Panel's findings and reasoning based on the language of the Decision and my own review of the administrative record.

The Panel Decision can be divided into its findings as to what actually happened during M.P.'s three years at CCS and what the Panel concluded should have happened.  I first review the

---

[1] The family dated M.P.'s application as "1/9/2010," which appears to be an error.  Most likely, the family completed the application on that date in 2011, since M.P.'s application was marked as received in January 2011.

former.  The Panel found that "during the fall" of 2011, M.P.'s first grade year, he was exhibiting "certain behaviors" in class and his teacher and mother worked together to determine if he was having some kind of seizure.  Panel Decision 10.  M.P.'s mother consulted his neurologist and informed the teacher that, according to the neurologist, his behavior was not a seizure but could be a "possible processing issue" in reading.  *Id*.  The record shows that this Panel finding was based on emails between M.P.'s mother and teacher on November 3, 2011, in which they discussed M.P.'s epilepsy and that he would often "stare off," not respond when spoken to, and be unable to recollect what was being taught.  *See* A.R. at 442.  In that email, M.P.'s teacher told his mother:  "I contacted special services today and talked to her about writing up a 504 [Plan] or IEP for [M.P.] due to his epilepsy . . . ."  *Id.*

The Panel also found that M.P.'s mother "at some point during [his] first grade year requested . . . a psycho educational evaluation of [M.P.] for dyslexia reading and testing for Student's attention difficulties."  Panel Decision 10.   This request, according to the Panel, "was based on and consistent with" a note from M.P.'s neurologist, which his mother provided to CCS sometime between December 20, 2011 and February [3], 2012.[2]  *Id.*  More precisely, emails in the record suggest that the mother's request was made sometime before January 27, 2012, when it is clear that she had already informed the school of M.P.'s dyslexia diagnosis.  *See* A.R. at 444.

Unfortunately, CCS did not comply with the family's request but instead scheduled M.P. for a far more limited evaluation—a test for Irlene Syndrome (light sensitivity)—without informing his mother of the change.[3]  Panel Decision 10.  CCS gave M.P.'s mother a Permission to Evaluate form

---

[2] At different points in the Decision, the Panel identified the end of this range as "before February 2, 2012," *id.* at 10, and "no later than February 3, 2012," *id.* at 12.  Based on the record, I assume "February 2" was a typo.

[3] CCS could not explain its failure to comply with the mother's request for a complete evaluation.  In a February 3, 2012 email between special education teachers, Kathleen Long and Laura Axtell, Long acknowledged M.P.'s dyslexia diagnosis and his mother's psycho-educational evaluation request, and asked Axtell if the school should issue a request for permission to do a full evaluation of M.P.  Hr'g Tr. 97–99, A.R. at 269 (discussing emails at

3

on February 8, 2012, which she signed the same day, *see* A.R. at 446–47, but the Panel concluded that the document did not "put mother on notice that [M.P.] would not receive the psycho educational evaluation" she requested. Panel Decision 10. Afterward, despite M.P.'s mother's repeated inquiries about the test results, CCS waited until 2014 to inform her that it had not done the comprehensive testing she requested. *See id.*

M.P.'s academic struggles, anxiety issues, and frequent, health-related absences continued into third grade, when his family hired a private tutor to work with him and his sister. In late March of that year (2014), CCS initiated an Informal Educational Evaluation by the school psychologist who determined that M.P.'s reading skills were "average" but that he needed more consistent attendance and "catch-up support," to be closely monitored, a consult with a speech/language therapist, and possible counseling for anxiety. A.R. at 524–29. The family disagreed with these results and requested, pursuant to their IDEA rights, a more comprehensive, school-funded independent evaluation. That evaluation, conducted on May 8, 2014 by Dr. Lynn Erb, Ph.D., revealed that M.P. had learning disabilities in math, reading, and written language, ADHD, and problems with memory and executive functioning. *Id.* at 560.

Less than three weeks later, on May 27, 2014, CCS finalized an IEP for M.P., just before the close of his third grade year. *See* IEP, ECF No. 21-1 at 159–170. The Panel found the IEP "adequate," in that it "discuss[ed] [M.P.'s] particular, specific needs that result from his Disability," proposed evaluating him for occupational therapy, and "addresse[d] his focus and attention deficits, reading comprehension, written expression and math calculation with benchmarks." Panel Decision 11, 13. The Panel emphasized that the IEP was "reviewed in detail by the Panel in light of the Independent Educational Evaluation done by Dr. Lynn Erb, Ph.D. and was found to be sufficient [—]not only agreeable by Mother." *Id.* at 13. The IEP itself shows that it classified M.P. as

---

A.R. 444). Instead, CCS performed only the light sensitivity test. At the hearing, Long could not recall why the requested, more comprehensive evaluation was not done. *See* Hr'g Tr. 131–33, A.R. at 277.

disabled in the Other Health Impairment and Learning Disability categories. IEP 1. It recommended small group instruction in math, reading, and writing, and that he be evaluated for speech/language and occupational therapy, *id.* at 3—but, CCS failed to perform these recommended evaluations in the nearly four months between the creation of the IEP and M.P.'s withdrawal from CCS.[4] The IEP team concluded that Extended School Year (ESY) was not required, *id.* at 11, but CCS gave M.P.'s family the option of sending him to summer school (with instruction presumably governed by the new IEP), which the family declined. Panel Decision 11.

Moving to what CCS should have done differently in educating M.P., the Panel concluded that he needed an IEP to receive an appropriate education and that the IEP should have been in place far sooner. The Panel stated that CCS "finally did what it was supposed to do" on May 28, 2014, the first day the IEP was in place. This is the closest the Panel came to a clear announcement that M.P. had, until then, not received the free and appropriate public education ("FAPE") the IDEA guarantees. But exactly when, according to the Panel, M.P. should have been issued an IEP is unclear. The Panel seems to have concluded that CCS had "enough information" to know that M.P. "qualified for an IEP" by February 3, 2012 at the latest. *See* Panel Decision 12. The Panel wrote: "The evidence was that [CCS] had [MP's neurologist's] diagnosis of epilepsy in late September 2011 but that more critically . . . [the neurologist] was suggesting [that the] school do a psycho educational testing [sic] [of] Student for Dyslexia Reading and attention testing." *Id.* The Panel concluded that the school knew all this, and also of his poor results on the limited testing it had performed by—at the latest—February 3, 2012. *Id.*

The Panel also emphasized that the school should have complied with the mother's request for a comprehensive psycho-educational evaluation and that the "limited" assessments done in M.P.'s first grade year were inadequate. *Id.* at 12. The Panel deemed her request "equivalent to a

---

[4] These IEP recommendations align with the report by Dr. Erb, who concluded that M.P. should be evaluated for these special services and for vision therapy. *See* A.R. at 553–67.

request for Initial Evaluation" under the IDEA. *Id.* at 10; *see* 20 U.S.C. § 1414(a)(1)(B)–(C)(i) (setting out procedures for complying with a parent's request for an initial evaluation). Accordingly, the school's failure to comply—or to notify her of its refusal to do so—violated not only the IDEA but also the Delaware regulations implementing it. *Id.* at 12 (citing 14 Del. Admin. Code 926.3.1–2, which requires schools to provide written notice to parents before they propose to change the evaluation of, or refuse to evaluate, a child with a disability). But the Panel's focus on the mother's request seems to have factored principally into its timeliness analysis, rather than its decision on when the IEP should have been in place; it found the Complaint timely because the family filed it within two years after CCS finally informed them that it had not done the requested testing. *See id.* at 12; *see generally* 20 U.S.C. § 1415(C) (explaining that a hearing request is timely when filed within two years of the date the parent knew or should have known of the violation).

With no clear decision as to the date by which CCS should have identified M.P. as eligible for an IEP, the Panel next analyzed "if [CCS] should have been testing to formulate what the IEP would include, when should [CCS] have had an IEP in place." *See id.* at 13. Presumably, this inquiry sought to analyze how much time CCS reasonably needed to develop and implement an IEP once an evaluation determined he needed one. The Panel wrote:

> [G]iven the complexity of the Student's symptoms, it is reasonable that Student should have had an IEP by the beginning of his Second School Year. In reaching this conclusion, we believed that it should have been done in about the same time frame as when the Student returned from Pertussis in the third grade until completion."

*Id.* The Panel made no attempt to explain its reference to M.P.'s third grade pertussis absence and I can glean no significance from it.[5] I therefore return to the Panel's earlier finding that CCS "should

---

[5] Presumably, the Panel was referring to the five-month period beginning January of M.P.'s third-grade year, when he returned to school after his lengthy pertussis absence, to late May, when his IEP was implemented—or perhaps to early June, when he completed third grade. *See id.* at 6 n.5. CCS suggests that the Panel was in fact referring to a shorter period—from March 20, 2014, when the family requested a meeting with Special Services, to the end of May, when the IEP was implemented—and urges that the Panel was "us[ing] this timing in the

6

have completed the testing requested by Mother and completed an [IEP] by the start of Student's second grade year [late August 2012]. This was a reasonable amount of time." *Id.* at 11. Because the Panel concluded that the school should have known of M.P.'s need for an IEP before February 3, 2012, it appears that this "reasonable time" conclusion gave the school from then until August 2012, when M.P. began second grade. In other words, the Panel concluded—without explanation—that, from the time the school should have identified M.P. as needing an IEP, it would have been reasonable for CCS to take an additional six or seven months to create one. In actuality, the record shows that, when a comprehensive evaluation was finally conducted (by Dr. Erb on May 8, 2014), just seven days after the family requested it, the school finalized his IEP just nineteen days later—a total of twenty-six days from the evaluation request to the finalized IEP.

The Panel ultimately awarded full, seven-hour days[6] of compensatory education [hereinafter "comp. ed."] for M.P.'s second grade year and most of third grade, through the day the IEP was implemented at the very end of the year (May 28, 2014). The Panel did not hear evidence from either party as to the appropriate hourly rate. *See* Hr'g Tr. 654–55, A.R. at 158–59; Mem. 4, Robinson, J. (Jan. 6, 2017), ECF No. 27 ([P]laintiffs' counsel was under the impression that 'the issue of relief' would be addressed in a separate hearing and, therefore, neither party affirmatively presented relevant evidence."). Instead, the Panel concluded that the rate would be $17.50 per hour, based solely on the fact that the family had at one point paid a tutor $35 per hour to tutor M.P. and his sister: "District [sic][7] set forth no basis why the rates should be $75 per hour when Mother was paying a tutor who was a certified special education teacher $35 per hour to teach 2 students . . . ."

---

Student's 3rd grade year[,] when an appropriate IEP was put in to place[,] as a proxy for what [CCS] should have done at the end of Student's 1st grade year (to be in place for the beginning of the second [grade] year.)" Def.'s Mot. 10–11. Even if so, the relevant "proxy" time frame would be from Dr. Erb's evaluation to the creation of the IEP, as explained below.

[6] Contrary to the family's request for eight-hour days of comp. ed., the Panel adjusted to seven-hour days, which it deemed to be "the amount of instructional time" in a school day. Panel Decision 11, 13.

[7] Presumably, here the Panel meant to refer to plaintiff, not CCS.

Panel Decision 13. The Panel decided that the award should not be reduced by the meager homebound instruction hours provided during the pertussis absence, because they were "not pursuant to an IEP" and, as such, "do not offset the educational deficit" to M.P. *Id.* at 11. Finally, the Panel held that the funds must be used "for [M.P's] educational benefit" no later than December 11, 2019—four years from the date of the Decision—because M.P. "has an educational deficit and the sooner addressed the better prospect of greater remediation." *Id.* at 13. The Panel ordered that any funds not used within that timeframe be returned to "District, and if District not around, the school district student is [then] attending."[8]

## II. Standard

The governing standard in this case, as I recently stated in the related case of M.P.'s sister, is as follows:

> In an IDEA appeal from a Due Process administrative proceeding, the reviewing court must base its decision on the preponderance of the evidence and may 'grant such relief as the court determines is appropriate.' Unlike judicial review of most other agency actions, in which district courts apply a 'highly deferential standard of review,' courts reviewing IDEA appeals 'must decide independently whether the requirements of the IDEA are met.' The Supreme Court has described the IDEA's legislative history as an 'unusually clear indication that Congress intended courts to undertake substantive review instead of relying on the conclusions of the state agency.'
> But the Supreme Court has also cautioned that the IDEA's preponderance of the evidence standard is not an 'invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.' Focusing on the IDEA's requirement that the reviewing court receive the administrative record from the state proceeding, the Supreme Court in *Rowley* held that district courts are bound by an 'implied requirement that due weight shall be given to these proceedings.' *Rowley*'s 'due weight' pronouncement left lower courts to determine 'how much weight is 'due.' In the decades since, the Third Circuit has fleshed out what it means to 'give due weight and deference' to the findings of a hearing officer or panel, dubbing it a 'modified *de novo*' review [. . .] [in which] Plaintiffs' claims for compensatory education [] are subject to plenary review as conclusions of law. But . . . whether the School District fulfilled its FAPE obligations [is] subject to clear error review as [a] question[] of fact. Such factual findings from the administrative proceedings are to be considered prima facie

---

[8] The Panel referred to CCS as "District" throughout its opinion. Here, I assume that the Panel meant that if CCS is no longer in business in four years, the unused funds would be forwarded to the district M.P. is then attending.

correct, and if we do not adhere to those findings, we must explain why. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012); *accord Susan N.*, 70 F.3d at 758 (holding that a reviewing district court may not ignore the administrative agency's findings, but must instead consider them 'carefully and endeavor to respond' and, 'after such consideration, the court is free to accept or reject the findings in part or in whole'). Where a hearing decision lacks 'reasoned and specific findings,' there is less for district courts to consider and the administrative decision therefore deserves 'little deference.'

*Rayna P. v. Campus Cmty. Sch.*, 2018 WL 3825893, at *4 (D. Del. 2018) (some citations omitted).

### III. Discussion

On appeal, Plaintiffs raise four challenges to the Panel's comp. ed. award. Pls.' Mot. 3. First, they contend that the Panel erred by not awarding comp. ed. for first grade, despite CCS's failure to perform a comprehensive evaluation or create an IEP during that school year. Second, they argue that the Panel should have compensated M.P. for three summers of ESY, because he would have been entitled to that instruction under an adequate, timely IEP. Third, they assert that the Panel incorrectly calculated and undervalued M.P.'s comp. ed. when it ordered reimbursement at an hourly rate of $17.50. Lastly, Plaintiffs claim that the Panel's four-year time limit is unreasonable. *Id.* at 3–5. CCS, of course, asks that the Decision be affirmed in full. Def.'s Mot. 2. After careful review of the record and the Panel's Decision, I concur with many of the Panel's factual findings but am compelled to depart from several of its apparent legal conclusions related to compensatory education. Accordingly, I will affirm the Panel's decision not to award comp. ed. for ESY, but will otherwise grant the relief Plaintiffs seek: compensation for part of first grade, an increased hourly rate, and elimination of the four-year limit on the use of funds.

   A. <u>First Grade: IDEA Non-Compliance and Compensatory Education</u>

Plaintiffs ask that I amend the Panel's award to grant an additional, full year of comp. ed. for CCS's failure to provide a FAPE in first grade. Here, I will grant partial relief because, after careful consideration of the Panel's factual findings, I conclude that M.P. was denied a FAPE for most of

that year, and that CCS could reasonably have implemented an IEP by February 1, 2012, ninety days after his teacher's request that he be considered for one.

The Panel's decision to compensate M.P. for second and third grade, but not for first, is a legal conclusion subject to plenary review on appeal. *See D.K.*, 696 F.3d at 243. I review the Panel Decision in light of Supreme Court and Third Circuit guidance that the IDEA "should be interpreted expansively to provide a comprehensive remedy for children deprived of a FAPE." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 618–19 (3d Cir. 2015*)*. In this Circuit, children who are denied a FAPE have a right to comp. ed. "for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Id.* Comp. ed. awards seek to make children "whole" by providing them with "all education and related services previously denied and needed." *Id.* at 624.

To decide the appropriate comp. ed. award in M.P.'s case, then, I must first determine the length of time he was denied a FAPE. This is a factual determination which, in reviewing a Due Process panel decision, I must treat as *prima facie* correct unless the record shows that it is clearly erroneous. *See D.K.*, 696 F.3d at 243. Here, the Panel did not use the term "FAPE" or make any explicit finding as to the length of time M.P. was denied an appropriate education but did announce that May 28, 2014, the day his IEP took effect, was when CCS "finally [did] what it was supposed to do." *See* Panel Decision 13. This implies a clear finding that CCS was not fulfilling its obligation to provide a FAPE for M.P. until that time. As explained above, I find ample support in the record for this conclusion, including that M.P., from the very beginning of first grade, was struggling academically and socially in class, did not have help from a reading specialist, was exhibiting what his teacher perceived to be seizure-like symptoms in class, and had fallen behind because of frequent, health-related absences and early dismissals.

But the record compels me to disagree with the Panel's conclusion as to the time it should

reasonably have taken CCS to implement an IEP. The Panel made a clear finding that CCS should have known M.P. qualified for an IEP by "no later" than February 3, 2012. I find this conclusion supported by the record as far as it establishes that M.P. was indeed entitled to an IEP in his first grade year. In terms of the time it should have taken to develop said IEP, however, this finding ignores, without explanation, a direct and well-founded request by M.P.'s mother for evaluation in early November that inexplicably did not result in a full evaluation. I cannot reconcile this undisputed evidence with the Panel's ultimate, unexplained conclusion that the IEP need not have been in place until the start of second grade, because the controlling standard is "the time reasonably required for [CCS] to rectify the problem." *See G.L.*, 802 F. 3d at 618–19. Faced with this lack of clarity, I reject the Panel's decision to excuse a full year of FAPE denial as "reasonable."[9] *See Reid v. D.C.*, 401 F.3d 516, 521 (D.C. Cir. 2005) (hearing decisions "without reasoned and specific findings deserve[] little deference").

Instead, I conclude that it would have been reasonable for CCS to implement an appropriate IEP for M.P. by February 1, 2012. That is so because by early November, the school already knew of M.P.'s seizure disorder, that he required extra help from a reading specialist in kindergarten, and that he was struggling in class, frequently absent due to well-documented health issues and exhibiting odd behavior—he would stare off, unresponsive and unable to recollect what had been taught. Then, on November 3, 2011, his classroom teacher—presumably, the educator who spent the most time with M.P.—asked the school to consider him for an IEP or 504 Plan. These facts, taken together, easily triggered the school's duty under the IDEA to undertake a comprehensive

---

[9] It is possible—though far from clear—that the Panel relied on the mother's initial request as the primary trigger for CCS's independent duty to evaluate M.P. *Compare* Panel Decision 11 (stating that the time between her request and the start of second grade was a "reasonable amount of time" in which to complete the IEP) *with id.* at 12 (making no reference to the mother's request in the Panel's analysis of when CCS "had enough information such that [M.P.] qualified for an IEP"). To the extent that the Panel may have limited its award based on when M.P.'s mother requested an evaluation, I note that comp. ed. "accrue[s] from the point that the school district knows or should know" of the injury to the child and "a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem). . . ." *G.L.*, 802 F.3d at 618–19.

evaluation to identify M.P. as a child with a disability in need of special education. *See* 20 U.S.C. § 1412(a)(3)(A) (the IDEA's Child Find requirement); 34 C.F.R. 300.111(a)(1) and 14 Del. Admin. Code § 923(11.0) (both implementing the IDEA's Child Find requirement). The evaluation and IEP development combined should have taken no more than ninety days to complete. *See* 20 U.S.C. § 1414(a)(1)(C)(i)(I); 20 U.S.C. 1414(d)(2)(C) (the IDEA's evaluation and IEP development requirements); 34 C.F.R. § 300.301(c)(1)(i); 34 C.F.R. § 300.323(c) and 14 Del. Admin. Code § 925(2.3) (both implementing IDEA's evaluation and IEP development requirements). These procedural violations of the IDEA resulted in substantive harm to M.P. because they caused a more than a two-year delay in the creation of an IEP that would allow him to access an appropriate education. *See D.K.*, 696 F.3d at 251 (3d Cir. 2012); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010). I would have afforded CCS an additional ninety days after the teacher's November 3rd request—until February 1, 2012—to have conducted a comprehensive evaluation of M.P. and finalized an IEP. This is both the period proscribed by law and a reasonable period—it is in fact several weeks longer than the time it actually took to implement an IEP after the family's evaluation request in 2014.

In defending the Panel's determination that the IEP should reasonably have been in place by the start of M.P.'s second grade year, CCS argues that "[t]he reasonable amount of time for the school to identify a problem varies dramatically." Def.'s Mot 10. In support, CCS cites *D.K.*, 696 F.3d 233, which dealt with a delayed evaluation rather than the acceptable time frame between initial evaluation and IEP implementation. CCS contends that the *D.K.* Court "accept[ed]" a school's failure to evaluate the student within sixty days where the "student's behavior and focus issues were not atypical of children" that age. But *D.K.* made clear that this procedural noncompliance—the school's failure to evaluate the child within sixty days after receiving parental consent—was "insufficient to merit compensatory-education relief" only because it did not "result[]

in the substantive denial of a FAPE." *Id.* at 251 n.6. Here, the Panel found and I independently agree that M.P. needed an IEP to access a FAPE; therefore, CCS's failure to timely identify and evaluate him undoubtedly merits comp. ed. *See id.* More broadly, CCS's argument ignores the clearest evidence on this point: that, when CCS finally agreed to the comprehensive evaluation his family requested, it was conducted within a matter of days, and the school implemented an IEP less than three weeks later.

B. Extended School Year

Turning next to Plaintiffs claim for comp. ed. for three summers of ESY, Pls.' Mot. 29, I see no basis to reverse the Panel's decision. Schools must provide ESY where failure to do so would deprive students of a FAPE, meaning that it is required when a student cannot make meaningful progress on IEP goals without it. 34 C.F.R. § 300.106(a)(2); 14 Del. Admin. Code 923(6.0). Here, because M.P.'s IEP team decided that ESY was not required, this issue boils down to a dispute over whether his IEP was adequate. If so, then by definition the IEP was reasonably calculated to provide M.P. an appropriate education **without** ESY. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1,* 137 S. Ct. 988, 1001 (2017).

Whether an IEP is appropriate is a finding of fact, which I must consider *prima facie* correct. *See D.S.*, 602 F.3d 553, 564 (3d Cir. 2010). The IEP provided for specialized instruction for M.P. in reading, math, and writing,[10] directed that he be evaluated for occupational and speech and language therapy, and required that the IEP be amended based on those results. IEP 3. I see nothing in the administrative record, including in Dr. Erb's report, that compels me to reverse the Panel's finding that the individualized instruction and special services set out in the IEP were adequate to ensure appropriate progress for M.P.—let alone a basis to conclude that ESY in

---

[10] This included small group instruction in all three subject, repeated instructions, pairing visuals with auditory instruction, the use of graphic organizers and color overlays for reading, allowing extra time for processing, preferential seating, and frequent prompts to refocus.

particular was lacking. And, while it is undisputed that CCS never carried out much of the IEP, including the recommended testing for speech/language and occupational therapy, that troubling fact does not alter the comp. ed. analysis because M.P. withdrew from the school before the school's failure could affect him.[11]

C. Hourly Rate for Compensatory Education

Next, Plaintiffs contend that the Panel relied on irrelevant evidence to reach an arbitrary, unreasonably low hourly rate of $17.50 for M.P.'s comp. ed. Pls.' Mot. 31. Previously, Judge Robinson agreed that the Panel's comp. ed. rate was "based on insufficient evidence that did not necessarily reflect the real world," and so granted the family's request to supplement the record with evidence as to the appropriate rate. Order 4, ECF No. 27. Although Judge Robinson gave both parties the opportunity to present new evidence on this point, only Plaintiffs did so. *See id.*

I now consider this new evidence, never before the Panel, to determine the appropriate compensation rate. The family submitted four verifications—three of their own, and a fourth, which CCS provided to the family but chose not to file:

- M.P.'s tutor, Jennifer Tracy, is a certified general and special education teacher in Delaware self-employed as an academic tutor who generally charged $40 per hour for one student in 2016. She explains that, because she was "very emotionally invested" in M.P. and his sister, she at one point charged the family only $35 per hour to tutor both children, which was "below [her] typical charge for tutoring even a single student." ECF No. 18-2 at 3. Although she now tutors only M.P. and not his sister, and still charges the family $35 per hour. She "knows of no . . . [qualified] tutor who would provide tutoring services to any student for $17.50 per hour." *Id.*

- Lindsay LaRiviere is Director of the Lindamood Bell Learning Processes, which offers "intensive, research-validated instruction" to "strengthen the sensory-cognitive functions needed for reading and comprehension." *Id.* at 4. Their instruction has been "proven" to be successful for children with learning challenges including dyslexia, ADHD, and specific learning disabilities. At their Learning Center in Wilmington in 2016, their published hourly

---
[11] The school's failure to conduct the recommended evaluations did not result in a denial of FAPE for M.P. because his family declined to send him to summer school after third grade and withdrew him from CCS at the start of fourth grade. The few days between the creation of the IEP and the end of third grade, when CCS's failures to fully implement the IEP could arguably have amounted to a FAPE denial, are not at issue here because Plaintiffs have opted not to pursue relief "for that relatively short period." *See* Pls.' Mot. 25 n.8.

14

charge was $118 per hour. *Id.* at 4–5.

- Beth Evans is Area Director of Club Z! In-Home Tutoring in Newark, which provides tutoring services for children at home at published hourly rates of $48 (for middle school students) to $50 (for high school students) for supplemental, homework-help tutoring that does not require any curriculum planning. *Id.* at 7–9.

- CCS's verification came from one of its employees, Heidi Greene, who is not a tutor but who works as an instructor at a Delaware liberal arts college "with educational tutors" who serve "general and special education students" in one-on-one and group settings in Kent County, Delaware. ECF No. 54-2. Those tutors, she claims, charge $30 to $45 per hour. *Id.*

Based on this new evidence, I conclude that the appropriate hourly rate for M.P.'s non-specialized comp. ed. is $45, and, for specialized services like Lindamood's, $118. I find Lindamood's rates highly relevant because they pertain to services tailored to address M.P.'s specific learning challenges. I reached the rate of $45 for non-specialized services by averaging the hourly rate of Ms. Tracy ($40) and ClubZ! ($50), because I find both verifications relevant and reliable.[12] I find Ms. Greene's verification far less valuable, since she is not a tutor herself, provides no details or supporting information about who the tutors are, their training, the nature of the tutoring, the extent of curriculum planning they provide, or how she knows their rates.[13]

Because M.P.'s award should compensate him for a period of FAPE deprivation that includes both specialized and non-specialized instruction, the hourly rate will be based on a ratio of both kinds of services.[14] In light of the IEP recommendations, and M.P.'s ADHD, dyslexia, and learning disabilities in reading, math, and writing, together with his possible need for speech/language, occupational, and vision therapy, I conclude that he should be compensated at a

---

[12] I used ClubZ!'s hourly rate for high schoolers since M.P. is now 13 and will be in high school for most of the time he is using the funds.

[13] My decision to compensate M.P. for non-specialized instruction at an hourly rate of $45 would not change even if I factored in the rates Ms. Greene discussed because presumably the low end of her range pertains to group tutoring for general education students, and the high end ($45/hour) pertains to one-on-one tutoring for special education children like M.P.

[14] As CCS acknowledges, the Panel "did not include specialized tutoring" in crafting its comp. ed. award. Def.'s Mot. 14.

ratio of 2:1—two hours of general instruction (at $45) for every hour of specialized instruction or service (at $118). That results in an hourly rate of $69.33, which I round to $70. *See Rayna P.*, 2018 WL 3825893, at *8 (affirming the panel's $75 hourly rate for comp. ed. in M.P.'s sister's case); *Heather D. v. Northampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 552 (E.D. Pa. 2007) (eleven years ago, setting an hourly rate of $75 for several years of comp. ed.).

D. Temporal Restriction on Use of Funds

Lastly, the family argues that the Panel's Order should be amended to eliminate the four-year limit on M.P.'s use of comp. ed. funds because it is unreasonable and "ignores the effect of an appeal on this matter." Pls.' Mot 37. I agree and amend the award accordingly.

In appeals from administrative decisions, the IDEA empowers district courts to "grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii). Here, M.P., who is currently thirteen years old, will be attending school full-time for several more years, so will need to take advantage of his comp. ed. outside of normal school hours. With more than two school years of comp. ed. in his fund, M.P. will clearly require several years to use the funds. In light of this, I find the Panel's belief—that the sooner his educational deficit is addressed, the better—well-intentioned, but its four-year limit unreasonable, especially now that only sixteen months remain before the December 2019 cut off and the family has yet to access any of the funds.

I conclude that it is appropriate in this case to eliminate the four-year limit and instead require M.P. to use the funds by the end of his twenty-first year. I so hold simply because I find that time frame reasonable in light of M.P.'s current age and special education needs—not because the IDEA mandates any such temporal restriction on relief. *See, e.g.*, *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 867 (3d Cir. 1990) (affirming an award of 2.5 years of comp. ed. beyond age

16

twenty-one for a disabled twelve-year-old).[15] The record shows that M.P.'s family has been active and involved in his education, and I have no doubt that, with advice from professionals, they are best suited to decide how and when to allocate M.P.'s comp. ed. funds over the next eight years.

**IV.  Modified Compensatory Education Award**

M.P.'s comp. ed. award will be modified as follows:  he will be compensated for a FAPE denial dating back to February 1, 2012 at an hourly rate of $70 and must use the funds by the end of his twenty-first year.  As originally ordered by the Panel, he will be compensated for full, seven-hour days, and CCS shall place the funds in a trust for M.P.  All other aspects of the Panel's Award remain in effect.

    /s/ Gerald Austin McHugh
United States District Judge

---

[15] CCS's only argument for upholding the four-year limit is that there is no prohibition on such restrictions.  *See* Def.'s Mot. 14.  I find this wholly unpersuasive; the mere fact that a time limit may be permissible under the law does not mean it is appropriate in the context of this case.